Sutherland, J.
It seems that the original grant to Vanderbilt, White, Wolfe, and their associates, of Sept. 22, 1849, and the modifications of that grant, of the 9th of March, 1850, were both ratified by the Legislature of Nicaragua.
The act or charter of these associates, of the 9th of March, 1850, as a corporation, by the name of “ The American Atlantic and Pacific Ship Canal Company” was by the “ supreme (Erector,” only; without—from aught that appears—the authority or sanction of the Legislature.
Were it a question in this case, whether the “ supreme director” had power thus to create a corporation, I should have to infer such power, solely from the fact that he undertook to claim and exercise the power, and from the subsequent acts of the authorities of Nicaragua and of them associates.
Though it be conceded that the “ supreme director” had power to create the corporation, it does not follow that the provisional president of the BepubHc of Nicaragua had power to annul or dissolve it by the decree of the 18th of February, 1856.
At common law, the king could create a corporation, but could not arbitrarily, and without a judicial proceeding, dissolve or destroy any corporation. Parhament, being theoretically omnipotent, could do so; but there are probably only two or three instances of the power having ever been exercised.
I must say, from the papers submitted on this motion, the presumption is that the “ provisional president of the Bepub-Ec of Nicaragua” had not power by the decree, or otherwise, arbitrarily, and without any legislative or judicial sanction or proceeding, to annul or dissolve the corporation.
But if he had, the decree did not completely annul or dissolve the corporation. By the first article of the decree, the act of incorporation is annulled and the corporation dissolved and aboHshed, except for certain purposes mentioned in the subsequent articles.
By the second article, certain individuals are named as com *11 missioners to liquidate and secure the sum due from the corporation to Nicaragua.
The fourth article substantially declares that the corporation shall only be continued in existence for the purpose of ascertaining how much is due to Nicaragua, and for the pur*pose of collecting it.
By the fifth article, the commission, after ascertaining the amount due to Nicaragua, are commanded to seize all the property of the corporation in Nicaragua, and to deposit it in the hands of respectable or responsible persons (receivers).
The sixth article, substantially declares that, for the public convenience, these respectable persons, or receivers, on giving security for the return of the property to the commissioners, shall take it and carry on the business of the corporation, at least as to the transit of passengers by the way of the Isthmus; and this section expressly declares, that the persons or receivers so taking the property, shall be obliged to transport passengers who may arrive on the Atlantic and on the Pacific, and the expense of such transportation of passengers shall be charged to the corporation.
The appointment of a receiver of all the property of a corporation does not annul its charter, nor can the seizure of all the property of a corporation dissolve it. Its charter, all its franchises, including its charter to the franchise to be a corporation, must be seized, or declared forfeited or annulled by some legal proceeding. The proceeding, by scire facias, to repeal the charter, appears to have been the only adverse legal proceeding at common law by which a chartered corporation could be so completely and finally annulled and annihilated ; but it could not afterwards, at any time,' be restored or revived with its old powers or suspended rights, and subject it to its old or suspended liabilities—(See Grant on Corporations, 295, 296, 300, 301, marg. pag.)
It seems that a judgment of seizure, in a quo warranto information or proceeding against the franchises of a corporation, either by charter or proscription, did not operate to dissolve the corporation, but only to suspend its regular operation during the pleasure’of the crown, and that notwithstanding such judgment of seizure, the corporation could be revived by a new *12 charter, which would, operate by rotation, so as to make the new body in all respects identical with the old, as regards debts, liabilities, &c.; and this though the name and the constitution of the body politic, were altered by the new charter. It also seems that the usual practice upon such seizure, was for the crown to appoint a cusios, who appears to have discharged all the functions, duties, &e., of the corporation until the restitution of the franchise or the revival of the corporation. (Grant on Corp., 300 to 303.) That such revival was only a continuation of the old corporation, and that the revived corporation was obliged to take the act or charter of revival with all the debts, liabilities, and rights of action of the old one, though there might be additional powers and regulations contained in the charter of revival. (See Grant on Corp., 304; R. v. Pasmore, 3 T. R., 247 ; Mayor, &c., of Colchester v. Seeber, 3 Burr, 1866; Mayor of Colchester v. Brooks, 7 Q. B., 53 Com. Law Rep. 383; Duttrell’s Case, 4 Rep., 87b.; King v. Knight, 4 Y. B., 245; Haddock’s Case, 4 Ventr., 355; S. C., T. Raymond, 435.)
That, a new name makes no difference, see also Bull, N. P., 213. As to the effect of a merger by act of the Legislature of the rights of an old corporation in a new one, and as to how far it is a dissolution of the old one, see Union Canal Co. v. Young, and others, 1 Wharton R., 410; Bellows v. Hallowell & Augusta Bank, 2 Mason C. C. R., 31; State Bank of Indiana v. State, 1 Black (Ind.) R., 273.
As to the effect of a corporation dissolving and reorganizing itself, as it regards debts owing by the corporation, see Longley v. The Longley Stage Co., 30 Maine (17 Shep.) R., 448; Bank of the United States v. The Commonwealth, 17 Penn. R. (5 Harris), 400.
Any one who will take the trouble to look carefully into the common law cases above cited, will see that the distinction between the absolute and, complete dissolution of a coloration and the suspension of its corporate rights and operations, .and between the effects of the grant and acceptance of a charter of revival and of a charter creating a new and original corporation, was taken and established from the most equitable consideration, and to prevent injustice resulting to third parties *13 from the common law effects of a complete dissolution of a corporation and its abstract nature, viewed in one aspect. The common law principles established or illustrated by these cases, throw great light not only upon the construction and effect to be given to the decree of the provisional president of the Republic of Nicaragua, on the 18th of February, 1856, but also upon the construction and effect to be given to the subsequent acts and dealings by and between the Nicaraguan authorities and the American Atlantic and Pacific Ship Canal Company, especially the new charter (if it can be called a charter) of that company, of March 20,1861, by the name of the Central American Transit Company, and its acceptance.
Notwithstanding the words of the first article of the decree of February, 1856, in view of the subsequent article of that decree, of the subsequent acts and dealings by and between the Nicaraguan authorities and the company, particularly the new charter or instrument of March 28, 1861, and in view of the common law principles and authorities above referred to, I am clearly of the opinion that the decree did not operate and was not intended to operate, even as between the corporation and Nicaragua, as a complete dissolution, or annihilation, of the corporation, presently or eventually. In my opinion this decree operated and was intended to operate, even as between the corporation and Nicaragua, not as extinguishment of the corporation, but only as a suspension of the corporate rights and operations by way of punishment, and for the purpose of securing what Nicaragua claimed as her due. Not only does the fourth article provide for the continuing existence of the corporation, for certain purposes, for an indefinite time, but the sixth article also provides for the continuing of the most important business or purpose of the corporation, through the custodians or receivers of the property, to be seized for an indefinite period.
Probably, in this case, if I am to assume that there was any ~ law in Nicaragua, I must assume it was the common law; and by the common law, on the complete dissolution of a corporation, its real estate went to the parties from whom it came, or their heirs, and its personal estate seems to have vested in the crown, as bona vacantia. If, then, the common law prevailed *14 in Nicaragua, and the decree operated as a complete dissolution of the corporation, the provisional President had no right to seize the real estate of the corporation for the debt or dues; and as to the personal, the provision by the fifth and sixth articles of the decree, providing for its seizure for the debt or dues, would seem to be inconsistent with an intended complete dissolution; for the fact of such complete dissolution alone would have vested it in Nicaragua or its authorities.
As to the continuation of the corporation by the fourth article for certain purposes only, it has been said (Guardians Woodbridge Union v. Guardian Colonies Union, 18 Law J., N. S., Q. B., 133, 134) that a corporation maybe dissolved for some purposes and not for others, but such a proposition or principle is not free from difficulties, and requires for my assent more examination than I can now make.
I am of the opinion, then, that the decree of February 18th, 1856, did not work a complete dissolution of the corporation, but that the decree left the corporation in such position or condition that it could be restored or revived with all its old rights and liabilities, as if the decree had never been made, by any competent act of the government or authorities of Nicaragua, waiving the decree, or by a new charter, and without referring-particularly to the grant, or contract, of June 19, 1837, called the “ Stebbins’ Company Grant,” or the modification of that grant by the decree of October 26,1857, or the act or decree of March 24,1859, repeating the Stebbins’ grant, so called—all of which appear to me be, to say the least, more or less inconsistent with the idea that the Nicaraguan government, or authorities, considered the corporation completely dissolved. I am of the opinion that the charter, contract or decree of March 20, 1861, was a complete recognition of the then existence of the corporation by the old name, under the old charter, and should be regarded as reviving, settling and confirming— with certain modifications of its constitutional articles, by way of compromise—its franchises, rights and privileges under its old charter and under the grants, contracts and dealings by and between Nicaragua and the company, previous to such act or instrument of confirmation and compromise.
This act or instrument did not disturb or undertake to dis *15 turb or affect the rights of property or of action, or indeed any rights or remedies of the company, as between the company and third parties; and there cannot be a doubt, I think, that it left the corporation, as between it and third parties, subject, in or by the new name, to its debts and liabilities contracted or incurred by or in the old name. As to third parties, creditors of the corporation by the old name, I am clearly of the opinion that the corporation by the new name and the corporation by the old name should be regarded as substantially—perhaps I should say as identically—the same corporation.
If the charter, contract or decree of March, 1861, can properly be called a neto charter, it should not be regarded as creating a new corporation, but as reviving and confirming and somewhat modifying an old one—certainly as to third parties, and more especially as to foreign creditors of the old one by the old name. And if it is proper to say that the property and franchises of the corporation, by the old name, were by the new charter merged-in or transferred to the corporation by the new name, certainly such merger or transfer was subject to all its debts and liabilities to third parties by or in the old name.
To show the correctness of these views as to the operation of the charter or instrument of 1861,1 refer particularly "to the first article, which declares that the shareholders in the American Atlantic and Pacific Ship Canal Company shall be recognized as a corporation (not that they shall be a corporation) Tinder the name “ Central American Transit Company.” And to the second article, which declares that all the shares which had been issued in the name of the former company should be included in the capital of three millions, of the corporation, by the new name, thus transferring to or leaving in the corporation by the new name, all the property of the corporation by the old name, which must be supposed to have been represented by the shares thus included in the corporation by the new name. And I refer also to the twenty-first article, which forcibly shows that the parties considered the charter or instrument of 1861 as a compromise, and that the Nicaraguan authorities recognized at least the claim of right by the company under the previous charter and contracts, and with other rights, the right to be a corporation. Moreover, I question whether the *16 “ Central American Transit Company,” as to the plaintiffs, ought to be permitted to set up that it was not a corporation by the old name, when the charter or instrument of 1861 was accepted, or that it is not the same corporation as the old one, by a different name. Whatever may have been the operation of the decree of 1856, the company did not admit that it annulled its charter. Notwithstanding the decree, it claimed to be a corporation and kept organized as a corporation, and the plaintiff performed services for it as a corporation, to recover pay for which this suit was brought against it by the name of the “American Atlantic and Pacific Ship Canal Company.” As a corporation, before the charter or instrument of 1861 was made and accepted, the defendant put in an answer as a corporation, by the old name, which answer was verified by one of its officers, and as the answer of a corporation. The Central American Transit Company, by the charter or instrument of 1861, succeeded to or was permitted to retain and did retain all the rights and property of the American Atlantic and Pacific Ship Canal Company, except that as between Nicaragua and the company, certain rights or franchises were somewhat modified or changed; but the main corporate purpose of the corporation under the old name and under the new was and is the same.
It may be that this motion was not necessary, but I think, under the circumstances it was prudent and should be granted, but without costs to either party.